IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| BRAD FAVER, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:16-cv-00287 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| HAROLD CLARKE, | ) |     United States District Judge |
|     Defendant. | ) | |

**MEMORANDUM OPINION**

Brad Faver, a Virginia inmate proceeding *pro se*, filed a civil action pursuant to 42 U.S.C. § 1983, alleging that defendant Harold Clarke, the Director of the Virginia Department of Corrections (VDOC), violated his religious rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1, *et seq*. The parties filed cross-motions for summary judgment, and this matter is ripe for disposition.[1] For the reasons stated herein, the court denies Faver's motion for summary judgment and grants in part and denies in part Clarke's motion for summary judgment.

I. BACKGROUND

Faver is a Muslim inmate housed at Augusta Correctional Center (Augusta). He alleges that, in accordance with his religion, he must grow a beard at least a fist's length, apply perfumed oils for prayer, and eat a diet containing meat that is "ritually slaughtered in the name of Allah."

---

[1] Faver also filed a motion pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, asking the court to delay ruling on Clarke's motion for summary judgment until certain discovery was provided. *See* Dkt. No. 30. Since that motion, Clarke has responded by providing some of the discovery, noting that some requested information does not exist, and objecting to other requests. *See* Dkt. Nos. 41 and 42. The court denied Faver's motion to compel and determined that as to the requests for admission and discovery that was not provided, Faver did not demonstrate that they were relevant to the adjudication of his claims or proportional to the needs of the case. The court also notes that despite the motion to stay, Faver filed a response in opposition to Clarke's motion for summary judgment and filed his own motion for summary judgment.
    Pursuant to Rule 56(d), if a nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Faver has not submitted an affidavit or declaration stating why he cannot present facts essential to justify his opposition. Further, even if he had submitted an affidavit, the facts which he states that he intends to show through the discovery that was not provided do not change the court's analysis. Accordingly, Faver's Rule 56(d) motion is denied.

He also alleges that his religious beliefs "prohibit[] the acquisition of religious accoutrements from a company that sells swine and idols." (Compl. 2, Dkt. No. 1.)

Faver claims that VDOC Operating Procedure (OP) 864.1 prohibits him from growing a fist-length beard; OP 802.1 requires him to acquire his perfumed oils from Keefe Commissary (Keefe) which "sells swine and idols"; and the VDOC does not offer a diet that is consistent with his "religious scruples." (Compl. 2, 3.)

## II. DISCUSSION

**A. Motion for Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If, however, the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). A plaintiff may not amend a complaint through argument in a brief opposing summary judgment. *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).

**B. Limitation on Damages**

Some of Faver's claims for monetary damages fail at the outset. Defendant Clarke is immune from damages claims for actions taken in his official capacity. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989). Moreover, RLUIPA does not authorize damages against a public official under the Spending Clause of the United States Constitution.[2] *See Sossamon v. Texas*, 563 U.S. 277, 282 n.1, 293 (2011) (prohibiting damages claims against state officials in their official capacity under the Spending Clause); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (same for individual capacity). Therefore, the court will grant summary judgment to Clarke on Faver's claims for damages against Clarke in his official capacity and for damages under RLUIPA.

**C. First Amendment and RLUIPA**

To state a viable claim under the First Amendment or RLUIPA, a plaintiff must demonstrate that the defendant prison official's actions or policies place a substantial burden on his free exercise of his sincere religious belief. *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981) (First Amendment); *Lovelace v. Lee*, 472 F.3d 174, 185 (4th Cir. 2006) (RLUIPA). A court must decide the threshold question of whether a plaintiff sincerely held the avowed belief and whether the belief is, in a plaintiff's own scheme of things, religious. *United States v. Seeger*, 380 U.S. 163, 185 (1965). Only a personal practice that is both sincerely held and rooted in religious belief is protected. *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972).

A substantial burden on religious exercise occurs when a government, through act or omission, "put[s] substantial pressure on an adherent to modify his behavior and to violate his

---

[2] The court considers Faver's RLUIPA claim only pursuant to the Spending Clause because he does not contend that RLUIPA applies under the Constitution's Commerce Clause. *See, e.g.*, *Washington v. Gonyea*, 731 F.3d 143, 146 (2d Cir. 2013) (declining to consider "whether RLUIPA authorizes individual-capacity suits under the imprimatur of the commerce clause" where plaintiff "pled no facts" pertaining to interstate commerce); *compare* 42 U.S.C. § 2000cc-1(b)(1) (Spending Clause provision), *with id.* § 2000cc-1(b)(2) (Commerce Clause provision).

3

beliefs." *Lovelace*, 472 F.3d at 187 (quoting *Thomas*, 450 U.S. at 718). The plaintiff bears the initial burden of establishing that the government's actions substantially burdened his exercise of religion. *See, e.g., Krieger v. Brown*, 496 F. App'x. 322, 324 (4th Cir. 2012). In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his religion." *Id.* at 325 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Nevertheless, "at a minimum the substantial burden test requires that a . . . plaintiff demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007). No substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Although incarcerated, a prisoner still "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 822 (1974). If the inmate establishes a substantial burden on his sincerely held religious belief, the next inquiry is whether the prison regulation is reasonably related to a legitimate penological interest. *Turner*, 482 U.S. at 89. Whether a regulation is reasonably related depends on:

> (1) [W]hether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right … remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4)

4

> whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns.

*Lovelace*, 472 F.3d at 200 (citing *Turner v. Safley*, 482 U.S. 78, 89-92 (1987)). In weighing these factors, the court must "respect the determinations of prison officials." *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991). The prisoner carries the burden of proof under the *Turner* analysis to disprove the validity of the prison regulation at issue. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that" the burden is "in furtherance of a compelling governmental interest[] and is the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000cc-1(a). Once a plaintiff produces *prima facie* evidence to support the claim that the challenged practice or law substantially burdens the plaintiff's sincere religious belief, the government bears the burden of persuasion on whether the practice or law is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-2(b). "The least-restrictive-means standard . . . requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Jehovah v. Clarke*, 798 F.3d 169, 177 (4th Cir. 2015) (quoting *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015)).

"Although RLUIPA must 'be construed in favor of a broad protection of religious exercise,' it must be applied 'with particular sensitivity to security concerns.'" *Couch v. Jabe*, 679 F.3d 197, 201 (4th Cir. 2012) (internal citation omitted) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)). "In this regard, 'RLUIPA [is not meant] to elevate accommodation of religious observances over an institution's need to maintain order and safety.'" *Id.* (alteration in

original) (quoting *Cutter*, 544 U.S. at 722. Prison officials satisfy the "least restrictive" prong of RLUIPA by demonstrating that they have considered and rejected less restrictive alternatives to the challenged practice. *See id.* at 203. The court is required to give deference to prison administrators' policy explanations. *See Lovelace*, 472 F.3d at 182 ("We confirm emphatically that any substantive explanation offered by the prison must be viewed with due deference.").

**D. Beard**

Faver asserts that OP 864.1 prohibits him from growing his beard at least a fist's length in accordance with his religious beliefs. OP 864.1, *Offender Grooming and Hygiene*, establishes uniform personal grooming standards for, *inter alia*, beards of offenders incarcerated in the VDOC, in order to facilitate the identification of offenders and promote safety, security, and sanitation. (Russell Aff. ¶¶ 5-6, Dkt. No. 25, Attach. 1.) This OP prohibits beards that could conceal contraband, promote identification with gangs, create a health, hygiene, or sanitation hazard, or could significantly compromise the ability to identify an offender. (*Id.* at ¶ 6.) Pursuant to OP 864.1, beards of one-quarter inch maximum length are permitted for all offenders in all VDOC facilities in order to accommodate religious, medical, and secular reasons for beards. (*Id.* at ¶ 7.) Offenders who violate this policy may be charged with Disciplinary Offense Code 133 (Refusal to Obey an Order). (*Id.*)

In support of Clarke's motion for summary judgment, Major Russell submits an affidavit stating that in addition to security concerns, positive identification of each offender is important in the event of escape from confinement. (*Id.* at ¶ 8.) Offenders with long hair and beards can rapidly change their appearance so as to compromise the need for rapid identification. (*Id.*) Even inside the prison, positive, quick identification of offenders facilitates the orderly operation of each facility. (*Id.*) Security is of paramount importance in an institutional setting. (*Id.*)

6

Major Russell also avers that beards that are longer than one-quarter of an inch also provide the offender with an additional place to hide contraband. (*Id.*) He states that the VDOC has had instances where offenders have hidden drugs or weapons in their beards, thereby placing staff and other offenders at "serious risk." (*Id.*) He further states that shorter beards facilitate routine searches of offenders by staff because the need to search the beards of male offenders is essentially eliminated. (*Id.*)

Clarke notes that this court has previously held, in *Coleman v. Jabe*, Civil Action No. 7:11cv518, 2014 U.S. Dist. LEXIS 67971, at *13-15, 2014 WL 2040097, at *4 (W.D. Va. May 16, 2014), that the VDOC's grooming policy, as it pertains to the one-quarter inch beard length maximum was valid. (Def. Mot. Summ. J. 10-11, Dkt. No. 25.) In *Coleman*, the court determined that the VDOC satisfied the least restrictive means test by articulating how its grooming policy furthered its compelling interest in safety and sanitation in the least restrictive means possible. *Coleman*, Civil Action No. 7:11cv518, 2014 U.S. Dist. LEXIS 67971, at *13-15, 2014 WL 2040097, at *4.

Since the court's decision in *Coleman*, the VDOC has added a new element to the grooming policy. The VDOC has made special accommodations for offenders who are persistent violators of the grooming policy and who assert that they cannot cut their beards due to their religious beliefs. Specifically, the VDOC has established a separate housing unit, known as the Grooming Standards Violator Housing Unit (VHU), for these individuals. (Russell Aff., Encl. A) The VHU is located at Wallens Ridge State Prison, and its objective is to manage and encourage compliance by male offenders who are in violation of the grooming standards. (*Id.*) As of August 1, 2016, the eligibility requirements for VHU are: (1) a conviction for Disciplinary Offense Code 133 (Refusal to Obey an Order) and (2) no past history of disruptive or assaultive behavior. (*Id.*)

7

In this case, Clarke does not challenge whether Faver has a sincere religious belief that he must grow a beard at least a fist's length or that the one-quarter inch beard policy substantially burdens his religious belief.

**1. First Amendment**

There being no dispute that the policy imposes a substantial burden on a Faver's sincere religious belief, the next inquiry with regard to a First Amendment analysis is whether the prison regulation is reasonably related to a legitimate penological interest. Faver does not meet his burden. Faver does not show that it is unreasonable for the VDOC to prohibit inmates from growing fist-length beards while housed in general population. Clarke argues that beard length is regulated due to safety and security concerns within the facility and/or in the event of an escape. These are legitimate penological government interests. *See, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). There is a "valid, rational connection" between regulating beard length and the legitimate penological interests addressed. *See Lovelace*, 472 F.3d at 182 (stating "emphatically that any substantive explanation offered by the prison must be viewed with due deference").

To the extent Faver argues that forty other states and the Federal Bureau of Prisons allow longer beards than the VDOC, the court notes that "[a]lthough prison policies from other jurisdictions provide some evidence as to feasibility of implementing a less restrictive means of achieving prison safety and security, it does not outweigh the deference owed to the expert judgment of prison officials who are more familiar with their own institutions than outside observers." *Fegans v. Norris*, 537 F.3d 897, 905 (8th Cir. 2008) (quoting *Hamilton v. Schriro*, 74 F.3d 1545, 1556 n. 15 (8th Cir. 1996)).

Faver also argues that an "obvious, easy alternative to the policy" would be to allow inmates to grow beards and require them to carry a comb with them, presumably to aid in

8

searching the beard. The court finds this argument unpersuasive because it does not address defendant's concern for the need for rapid identification of inmates. And, Faver suggests no other alternative. Further, allowing longer beards would require more staff to search the beards. And, if an inmate snuck a weapon into his beard, he could harm other inmates or staff, including staff who would have to normally search the beards.

Having considered the *Turner* factors, the court concludes that Faver has not met his burden of disproving the validity of the grooming policy as it relates to beards. Accordingly, Clarke's motion for summary judgment will be granted, and Faver's motion for summary judgment will be denied as to Faver's First Amendment beard claim.

**2. RLUIPA**

In a RLUIPA analysis, because there is no dispute that the limitation on beard length poses a substantial burden on Faver's sincere religious belief, the burden shifts to Clarke to show that the policy is the least restrictive means of furthering a compelling governmental interest. Safety and security are compelling governmental interests. *See McRae v. Johnson*, 261 F. App'x 554, 558 (4th Cir. 2008). While Clarke demonstrates compelling governmental interests in limiting beard length, he has not established that the current provisions of the grooming policy are the least restrictive means of achieving the desired goal. In support of his argument that the current policy is the least restrictive means, Clarke points to the court's finding in *Coleman*. Clarke does not discuss why the VDOC lacks other means of achieving its desired goal without imposing a substantial burden on Faver. Further, Clarke does not discuss any alternatives to the current policy that the VDOC has considered and rejected.

In support of Clarke's motion for summary judgment, Major Russell submits that the VDOC has had instances where offenders have hidden drugs or weapons in their beards. However, he does not describe how long the beards were in those instances. Major Russell also

9

states that longer beards provide offenders with an additional place to hide contraband, thereby placing staff and other offenders at "serious risk." However, he does not define "longer beards." It seems to the court that it would be easier to hide contraband in a twelve-inch beard than in a one-half inch beard. Neither Major Russell nor Clarke explain where a fist-length beard falls on that continuum.

The court finds that Clarke's reliance on the court's decision in *Coleman* and the vague statements about past incidents are insufficient to carry his burden under RLUIPA. Accordingly, the court will deny Clarke's motion for summary judgment as to Faver's beard claim under RLUIPA.[3]

Faver also filed a motion for summary judgment as to this claim. And, for purposes of his motion, the court must draw all reasonable inferences in favor of Clarke. With that lens, the court finds a genuine dispute as to whether the beard policy is the least restrictive means. Accordingly, the court will deny Favor's motion for summary judgment as to this claim as well.

**E. Prayer Oil**

Faver states that, in accordance with his religious beliefs, he must use perfumed oils during prayers and that he cannot buy these oils from a company that "sells swine and idols." OP 802.1, *Offender Property*, sets forth the guidelines for offender property and purchases. (Shires Aff. ¶ 4, Dkt. No. 25, Attach. 3.) Pursuant to OP 802.1(IV)(B)(10), all religious personal property items must be purchased through the facility commissary, and Augusta's facility commissary is Keefe. (*Id.*) Offenders within the VDOC are allowed to purchase non-flammable prayer oils through Keefe. (*Id.* ¶ 5.) Keefe also sells pork products. (Collier Aff. ¶ 11, Dkt. No. 25, Attach. 2.)

---

[3] The court notes that its decision today does not mean that the Clarke cannot demonstrate that the policy is the least restrictive means; he just has not done so yet. If Clarke submits further argument in support of his claim that the policy is the least restrictive means, the court will consider that argument at that time.

In support of Clarke's motion for summary judgment, Augusta's Property Supervisor, N. Shires, avers that Faver has been purchasing prayer oils from Keefe for the past twelve months. (Shires Aff. ¶ 7.) In response to the motion for summary judgment and under penalty of perjury, Faver insists that he "sincerely believes that he must apply prayer oil… and he must acquire [the oil] . . . from a source that does not engage in illegal (under Islamic law) practices." (Faver Resp. Opp. M. Summ. J. 14, Dkt. No. 31.) He also states that because Keefe "sells swine and idols," it violates his beliefs to purchase his religious accoutrements from Keefe. (*Id.*)

In considering the First Amendment and RLUIPA claims, the court must decide the threshold question of whether Faver sincerely held the avowed belief and whether the belief is, in Faver's own scheme of things, religious. The court concludes that, viewing the record as a whole and drawing all reasonable inferences in the light most favorable to Clarke as to Faver's motion, there is a genuine dispute as to whether Faver sincerely holds the belief that he cannot buy his prayer oils from a company that "sells swine and idols." Accordingly, the court will deny Faver's motion for summary judgment as to his prayer oil claims.

However, for purposes of Clarke's motion for summary judgment, the court will assume, for purposed of the motion only, that the single-vendor policy substantially burdens Faver's sincere religious belief and will continue its analysis under the First Amendment and RLUIPA.

**1. First Amendment**

The court must consider whether the single-vendor policy is reasonably related to a legitimate penological interest. The burden is on Faver to disprove the validity of the policy.

In support of Clarke's motion for summary judgment, N. Shires avers that, by limiting offender purchases to Keefe only, the VDOC decreases the changes of contraband entering the prisons and items being tampered with prior to entering the facilities. The policy also necessitates that the VDOC approve an item only once before it is added to the approved list,

making the process more uniform and standardized and, thus, easier to monitor for security purposes. (Shires Aff. ¶5.) Keeping contraband out of prisons for safety and security is a legitimate penological governmental interest. *See McRae*, 261 F. App'x at 558. And, there is a "valid, rational connection" between the single-vendor policy and the legitimate penological interests addressed.

Faver contends that the single-vendor policy is not based on "any security or penological concern," but rather based on a "profit-sharing contract obligation" with Keefe. (Faver Aff. ¶ 40.) Clarke provided Faver with a copy of the VDOC's contract with Keefe, and yet Faver points to no provision that supports his theory.

With regard to "obvious, easy alternatives," Faver submits an affidavit from a vendor who states that she sells "correctional friendly" prayer oils to correctional facilities in Virginia and other states. (Khan Aff. ¶¶ 3-4, Dkt. No. 35.) Clarke does not address whether this vendor would be suitable to provide oils to VDOC facilities. The impact that having a new vendor would have on guards, other inmates, and prison resources is unclear, other than the initial time spent finding a suitable vendor, negotiating a new contract, and approving the oils for prison entry.

In weighing the *Turner* factors, the court concludes that Faver has not disproved the validity of the single-vendor policy and, thus, the court will grant Clarke's motion for summary judgment as to Faver's First Amendment oils claim.

**2. RLUIPA**

Under RLUIPA, the burden shifts to Clarke to show that the single vendor policy is the least restrictive means of furthering a compelling governmental interest. As the court previously stated, safety and security are compelling governmental interests. *See McRae*, 261 F. App'x at

558. However, Clarke has not demonstrated that the single-vendor policy is the least restrictive means of achieving the desired goal.

In support of his argument that the current policy is the least restrictive means, Clarke points to the court's finding in *Coleman*. Clarke does not discuss why the VDOC lacks other means of achieving its desired goal without imposing a substantial burden on Faver. Further, Clarke does not discuss any alternatives to the current policy that the VDOC has considered and rejected. While Clarke argues that having a single vendor keeps contraband out of the facilities, Faver states that Jewish inmates are allowed to order items from an alternative vendor, and Clarke does not suggest that there have been any problems with this alternative vendor. Clarke also does not explain why approving an alternative vendor for prayer oils, like the similar accommodation for Jewish inmates, cannot be done.

The court finds that Clarke's reliance on the court's decision in *Coleman* and his conclusion that current policy is the least restrictive means are insufficient to carry his burden under RLUIPA. Accordingly, the court will deny Clarke's motion for summary judgment as to Faver's prayer oil claim under RLUIPA.[4]

**F. Diet**

Faver asserts that, in accordance with his religious beliefs, he must eat a diet containing meat that is "ritually slaughtered in the name of Allah," which the VDOC does not provide. The VDOC offers the Common Fare diet for offenders who have specialized dietary needs, and the Common Fare diet is served at Augusta. The Common Fare diet is intended to accommodate offenders whose religious dietary needs cannot be met by the Master Menu. (Collier Aff. ¶ 4.) The Common Fare menu has been analyzed and certified as meeting or exceeding minimum

---

[4] The court notes that its decision today does not mean that the Clarke cannot demonstrate that the policy is the least restrictive means; he just has not done so yet. If Clarke submits further argument in support of his claim that the policy is the least restrictive means, the court will consider that argument at that time.

daily nutritional requirements. (*Id.*) All food purchased for Common Fare, except fresh fruits and vegetables, are certified by a recognized Orthodox Standard, such as "U," "K," or "CRC" and no pork or pork derivatives are used. (*Id.* ¶ 5.) The Common Fare menu meets Islamic dietary guidelines. (*Id.* ¶ 7.) The proteins used in the Common Fare diet are considered Kosher and do not contain any pork or pork derivatives, as prohibited by a Halal diet. (*Id.*) The Common Fare menu provides for fresh, uncooked fruits and vegetables, as required by a Halal diet. (*Id.*) While the Common Fare menu may not offer every possible food item not specifically prohibited for those of the Islamic faith, neither does the Master Menu include every possible food item which might be desired by offenders receiving regular meals. (*Id.* ¶ 8.)

Offenders who wish to receive a Common Fare diet are reviewed to determine whether or not they hold a sincere religious belief that requires a Common Fare diet rather than food served on the Master Menu. (*Id.* ¶ 9.) Offenders are required to sign a participation agreement prior to beginning the Common Fare diet. (*Id.*) Augusta's Food Services Director N. Collier avers that records indicate that Faver identified as a Sunni Muslim as of March 6, 2009, stating that he had been practicing this faith since 1994. (*Id.* ¶ 10.) Faver also stated, at that time, that the reason he was applying for the Common Fare menu was because it was the only menu that met his religious requirements. (*Id.*) Notably, Faver has been on and off the Common Fare menu since his incarceration, and as recently as January 2016, he had requested to be removed from the Common Fare menu. (*Id.*) Collier also avers that as recently as October 11, 2016, "Faver has been ordering perishable food items from Keefe Commissary that contain pork and . . . pork derivative items." (*Id.* ¶ 11.)

In an affidavit attached to his motion for summary judgment, Faver states that he believes that Islam requires that he eat a Halal diet that contains meat ritually slaughtered in the name of Allah; that the VDOC does not recognize or offer a Halal diet; that the Common Fare diet does

14

not accommodate his religious dietary needs; and that since signing the Common Fare Agreement in 2009, he has come to the understanding that he must have a diet that contains meat ritually slaughtered in the name of Allah. (Faver Aff. ¶¶ 49-52, Dkt. No. 32, Attach. 1.) Faver asserts that while the Common Fare diet does not contain any meat slaughtered in the name of Allah, the Master Menu does serve it sometimes. (*Id.* ¶ 53.) Faver states that officials at Augusta "put up signs when they are serving pork or pork byproducts." (*Id.* ¶ 56.) Faver avers that he does not, and has not, knowingly, ordered any product from the commissary that contains pork or pork derivatives. (*Id.* ¶ 55.)

The court concludes that, viewing the record as a whole and drawing all reasonable inferences in the light most favorable to Clarke as to Faver's motion, there is a genuine dispute as to whether Faver sincerely holds the belief that he must eat a diet containing meat that is "ritually slaughtered in the name of Allah." Accordingly, the court will deny Faver's motion for summary judgment as to his diet claims.

However, for purposes of Clarke's motion for summary judgment, the court will assume that the diets available to Faver substantially burden his sincere religious belief and will continue its analysis under the First Amendment and RLUIPA.

**1. First Amendment**

The court must consider whether the Common Fare diet policy is reasonably related to a legitimate penological interest. The burden is on Faver to disprove the validity of the policy.

Clarke argues that the cost and logistics of attempting to provide different religious diets to every offender with different religious restrictions in every facility operated by the VDOC is practically impossible. Instead, the VDOC offers the Common Fare diet as an alternative to the Master Menu, and the Common Fare diet is designed to accommodate the religious needs of many offenders of different religions. While the Common Fare diet excludes foods that may be

15

permitted by some religions and prohibited by others, the diet is intended to allow many inmates to adhere to their religious dietary laws. (M. Summ. J. 15, Dkt. No. 25.)

Preserving prison resources and funds is a legitimate penological interest. *See Baines v. Hicks*, No. 3:14cv616, 2016 U.S. Dist. LEXIS 176116, at *38, 2016 WL 7380558, at *16 (E.D. Va. Dec. 20, 2016). And, there is a "valid, rational connection" between the Common Fare diet policy and the legitimate penological interest addressed.

Faver argues that "Halal chicken franks" are already served on the Master Menu; thus, there is "no reason" not to allow Faver to eat them. (Faver Brief in Opp. 13, Dkt. No. 31.) However, Faver does not consider that introducing those "franks" into an area that is cleaned and prepared for other religious requirements, or putting those "franks" on trays that are kept in a manner to meet other religious requirements, creates a burden on other inmates. Faver does not allege that he cannot buy meat from the commissary that is "ritually slaughtered in the name of Allah" to supplement the Common Fare diet.

In weighing the *Turner* factors, the court concludes that Faver has not disproved the validity of the Common Fare diet policy; thus, the court will grant Clark's motion for summary judgment as to Faver's First Amendment diet claim.

**2. RLUIPA**

Under a RLUIPA analysis, the court finds that Clarke has demonstrated a compelling governmental interest in not offering a multitude of different religious diets but has not demonstrated that the Common Fare diet policy is the least restrictive means of achieving the desired goal.

Clarke argues that cost and logistics prevent the VDOC from offering more diet options. However, Clarke provides no specific information concerning these factors. Clarke does not present any evidence to demonstrate why the VDOC lacks other means of achieving its desired

16

goal without imposing a substantial burden on Faver. Further, Clarke does not discuss any alternatives to the current policy that the VDOC has considered and rejected.

The court finds that Clarke's largely vague and unsupported statements concerning cost and logistics are insufficient to carry his burden under RLUIPA. Accordingly, the court will deny Clarke's motion for summary judgment as to Faver's diet claim under RLUIPA.[5]

### III. CONCLUSION

For the reasons stated herein, Faver's motion for summary judgment is denied, Clarke's motion for summary judgment is denied in part as to Faver's RLUIPA beard, prayer oils, and diet claims, and granted in part as to Faver's First Amendment claims, Faver's claims for damages against Clarke in his official capacity and under RLUIPA.

An appropriate order will be entered.

Entered: September 29, 2017.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge

---

[5] The court notes that its decision today does not mean that the Clarke cannot demonstrate that the policy is the least restrictive means; he just has not done so yet. If Clarke submits further argument in support of his claim that the policy is the least restrictive means, the court will consider that argument at that time.