CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

9/30/19

JULIA C. DUDLEY, CLERK
BY:     K. Dotson
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

| | | |
|---|---|---|
| BRAD FAVER, | ) | |
| Plaintiff, | ) | Civil Action No. 7:16cv00287 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| HAROLD CLARKE, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Brad Faver brings this action under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, *et seq.* He alleges that Defendant Harold Clarke, the Director of the Virginia Department of Corrections ("VDOC"), through a single-vendor policy, infringed on Faver's religious rights by depriving him of the opportunity to order prayer oils from a vendor that conforms to his religious beliefs. This matter is before me by the parties' consent under 28 U.S.C. § 636(c), ECF Nos. 56, 57, following a bench trial held on November 29, 2018, ECF No. 96. Having considered the evidence presented by the parties at trial and the arguments of counsel in their post-trial briefs, ECF Nos. 104, 105, I find that the VDOC's single-vendor policy does not violate Faver's rights under RLUIPA and that Faver is not entitled to relief.

## I. Background

### A.    *Relevant Facts & Procedural History*

At all times relevant to this dispute, Faver was an inmate in the VDOC and was housed at the Augusta Correctional Center ("ACC"). Compl. ¶ 3, ECF No. 1. Faver is a practicing Orthodox Sunni Muslim. Bench Trial Tr. 10:22–23 (Nov. 29, 2018), ECF No. 102 ("Tr."). His religious beliefs forbid him from purchasing items from stores or vendors that sell "idols, swine, or alcohol." Tr. 12:3–5. Idols, according to Faver, include any items associated with a religion

1

other than Islam. Tr. 13:3–10. This tenant of his faith is particularly strict as it concerns the purchase of religions items, such as prayer oils. *See* Tr. 13:15–16.

Clarke, according to Faver, "is legally responsible for all policies being enforced in the VDOC." Compl. ¶ 4. Pursuant to VDOC Operating Procedure ("O.P.") 802.1, inmates must purchase all religious items, other than publications, from the facility commissary. O.P. 802.1 § IV(B)(10), Joint Ex. 2, ECF No. 97-2. The facility commissary for the VDOC is Keefe Commissary Network, LLC ("Keefe"). *See* Tr. 45:4–13. Keefe, according to Faver, sells both swine and idols. Compl. ¶ 17. Because Faver's religious beliefs require him to use prayer oils while in a state of prayer, Faver contends that VDOC policy violates his religious beliefs by forcing him to choose between purchasing oils from Keefe or not using oils while in prayer. Compl. ¶¶ 8, 33.

In June 2016, Faver filed this lawsuit against Clarke alleging that the VDOC's policy requiring him to order prayer oils from Keefe violated his sincerely held religious beliefs under RLUIPA. Compl. ¶ 33.[1] He asserted that there was "no compelling reason for not allowing [him] to order his oils from a lawful source" and there were "less restrictive means to address any concerns" VDOC may have about him purchasing oils from other vendors by "naming one Islamically acceptable oil vendor." Compl. ¶ 34. He asked for relief in the form of a "declaration

---

[1] Faver's Complaint also included allegations that VDOC policy infringed his religious beliefs by not permitting him to grow a fist-length beard and by preventing him from eating meat "ritually slaughtered in the [n]ame of Allah." *See* Compl. ¶¶ 7, 10. He alleged causes of action for each of his claims under RLUIPA and 42 U.S.C. § 1983 (First Amendment), and he sought both compensatory and punitive damages, as well as declaratory and injunctive relief. Compl. ¶¶ 31–55. In September 2017, United States District Judge Elizabeth K. Dillon dismissed, on summary judgment, Faver's claims under the First Amendment. *See* Order of Sept. 29, 2017, ECF No. 46; *see also* Mem. Op. of Sept. 29, 2017, ECF No. 45. She further dismissed his damages claims under RLUIPA because it "does not authorize damages against a public official under the Spending Clause." *See* Mem. Op. of Sept. 29, 2017, at 3 & n.2. In November 2018, Faver moved to voluntarily dismiss his beard and diet claims. *See* Pl.'s Mot. to Dismiss, ECF No. 94. Thus, at the time of the bench trial, the only remaining claim before this Court was Faver's religious oils claim under RLUIPA.

stating that [O.P. 802.1] imposes a substantial burden on the free exercise of his religion" and that such policy violates RLUIPA. Compl. ¶¶ 45–46. He further asked this court to "enjoin[] Harold Clarke, his successors, agents, and assigns, to allow Faver" to acquire his prayer oils from "at least one unobjectionable Muslim oil vendor." Compl. ¶¶ 45–46, 52.

On November 29, 2018, the parties appeared before me for a bench trial at which I heard testimony from Faver as well as Marie Vargo, the Corrections Operations Administrator ("COA") for VDOC. Counsel for the parties agreed to present closing argument via written briefs. ECF Nos. 104, 105.

*B.*    *Summary of Bench Trial & Competing Evidence*

As part of his case-in-chief, Faver called only himself and Vargo. Faver testified that he was an adherent of "Sunni Muslim Orthodox Islam." Tr. 10:22–23. Among other things, his religious beliefs require him to use prayer oils during prayer so that he could "smell good and not distract anybody around [him] in [their] state of prayer." Tr. 11:18–20. His religious beliefs forbid him from purchasing religious items from any store or vendor that sells idols, swine, or alcohol, as such items would be considered "tainted in the sight of Allah." Tr. 12:3–5, 11–13. He first learned that aspect of his belief around 2015, though he acknowledged that he did not get a "clear understanding" of it until 2016. Tr. 12:16–18.

Though there were other vendors acceptable to his religion from whom Faver could purchase prayer oils, the VDOC permitted Faver to purchase his religious oils only from Keefe. *See* Tr. 14:9–13. Once he came to fully understand the nature of his beliefs in 2016, Faver stopped purchasing prayer oils from Keefe. *See* Tr. 14:3–6.[2] Faver did continue to purchase other

---

[2] In cross-examination, Faver acknowledged that Keefe's records reflected that he ordered prayer oils from Keefe twice after having signed his Complaint in this case. *See* Tr. 18:8–11, 20–25; 19:9–10, 19–23. He later explained, however, that he had not intentionally ordered oils from Keefe on these dates and that any orders reflected in the records were a product of administrative error on either his part or that of

items from Keefe, such as hygiene products and over-the-counter medication, but he acknowledged that his religion was "not as strict" about the purchase of non-religious items from such vendors. *See* Tr. 13:15–16; 15:15–16:7.

Faver also testified that for several months after he stopped ordering oils from Keefe, he was able to procure oils from another inmate named Yahya Gaston. Tr. 20:16–24; 22:13–19. According to Faver, Gaston got his oils from Halalco, a vendor acceptable to Faver's religion. Tr. 20:19–21; 22:7–10. Faver believed the VDOC permitted Gaston to order from Halalco "for medical reasons." Tr. 22:21–23.[3] Faver exchanged other commissary items with Gaston for the oils, a practice that Faver acknowledged was prohibited by the VDOC. Tr. 21:14–17. Around November 2015, Gaston left ACC after being granted parole. *See* Tr. 22:14–16. Afterwards, Faver rationed the remaining oil he had received from Gaston and cut it with mineral oil "to make it last longer." Tr. 23:18–24. Faver acknowledged that he did not know the source of the mineral oil, but he maintained that as long as he did not know the source, he could use the mineral oil with his prayer oil and not violate his religious beliefs against obtaining prayer oil from a vendor that sold prohibited items. *See* Tr. 24:2–27:14. Faver exhausted his supply of prayer oil about two months before trial. *See* Tr. 23:1–4.

Faver next called Vargo, who was also the only witness for Clarke. She testified that as the COA for the VDOC, she was responsible for coordinating with others in the VDOC to recommend changes to policy, Tr. 39:13–5, including to O.P. 802.1, also known as the VDOC's

---

Keefe. Tr. 35:17–25; 36:1–2. There was no indication that Faver had ordered any oils from Keefe, deliberately or otherwise, after July 2016.

[3] Vargo subsequently testified that, according to VDOC records, Gaston had only been permitted by a major at ACC to make a single purchase of prayer oil sometime after 2013 from an outside vendor "to get the ingredient list" because of an alleged allergy to the oil offered by Keefe. *See* Tr. 118:23–25; 119:1–25; 120:1–20. The vendor did not provide the list of ingredients, and Gaston did not purchase any more oils. Tr. 119:7–17. Gaston had been permitted, however, to purchase oils from an outside vendor "a couple of times" prior to 2013 while at another facility. Tr. 118:14–22.

"single-vendor policy," *see* Tr. 45:4–14. The VDOC implemented the single-vendor policy in 2013. Tr. 56:14–16. The single-vendor policy provides that inmates must purchase all religious personal property items through the facility commissary. O.P. 802.1 § IV(B)(10)(a); *see also* Tr. 45:12–14. Furthermore, any religious items offered for sale by the facility commissary needed to be precleared by the "Faith Review Committee"[4] and listed on the "Approved Religious Items" list. *See* O.P. 802.1 § IV(B)(10). Any item that an inmate sought to purchase that was not included on this list would need to be submitted to the Facility Unit Head for approval. *Id.* VDOC has entered into a products contract with Keefe to effectuate the single-vendor policy. Tr. 45:4–11.

According to Vargo, the purposes of the single-vendor policy are to bolster prison security and efficiently manage prison resources. *See* Tr. 53:11–19. These purposes are achieved largely because of the contractual relationship between the VDOC and Keefe. Under the contract, the VDOC controls key terms concerning both the products available for purchase by inmates and the procedures for ordering and delivering those products. Tr. 81:8–20; 85:15–24. In controlling the items available for purchase, the VDOC can create uniformity among products and avoid problems over inmate property. *See* Tr. 94:24–25; 95:1–4. For example, Vargo testified that before the VDOC implemented a single-vendor policy, inmates would get into fights over different types of shoes or use shoe color to affiliate with gangs. Tr. 94:15–95:2. Narrowing the type of shoes—or other products—available for purchase through Keefe helps prison officials manage these problems. *See* Tr. 95:3–5. Moreover, the VDOC's contract with Keefe provides it with control over the delivery process so that it can more easily screen

---

[4] The Faith Review Committee was a collection of individuals selected by the VDOC administration who meet quarterly to review items requested by inmates that are not offered on the Approved Religious Items list. *See* Tr. 47:9–18; 48:8–16.

deliveries for contraband entering the facility. VDOC's exclusive relationship with Keefe makes the screening process more predictable and efficient. *See* Tr. 99:1–17. As a further precaution, Keefe does not know the identity of any inmate who places an order, Tr. 89:3–8, and this blind ordering process protects against inmates coordinating with the vendor to have contraband delivered, Tr. 89:3–14, 90:13–15. Vargo noted that before the single-vendor policy, inmates were able to collaborate with small vendors to have contraband hidden in packages. Tr. 89:11–14; 99:1–17. She testified that products sent to VDOC facilities by Keefe have never contained contraband. Tr. 99:18–20.

For similar reasons, the VDOC's single-vendor policy allows the VDOC to operate more efficiently when searching and processing products sent to its facilities. *See* Tr. 53:11–19. Specifically, Vargo stated that the VDOC's contract obligates Keefe to a "fiduciary responsibility to procure items in a trustworthy manner." *See* Tr. 53:11–19. This fiduciary relationship has in turn "reduced the amount of time" prison staff would otherwise have to spend "going through property coming from virtually anywhere." Tr. 53:14–19. As she explained, when a product arrives from Keefe, VDOC officials know that it has been purchased and preapproved and need only be searched and sent to the facility. *See* Tr. 97:1–4. In contrast, products submitted from multiple vendors would require additional staff time because prison personnel would need to check the product against the inmate's order and confirm that the inmate himself actually ordered and paid for the product. Tr. 97:5–12. If the shipment from an outside vendor were not approved, it would need to be repacked and sent back to the vendor, which Vargo testified "we used to do . . . quite a bit" before implementing the single-vendor policy. *See* Tr. 97:16–23. Finally, using multiple vendors would also create logistical

complications because it would be more difficult to anticipate when different shipments might arrive. *See* Tr. 97:1–12.

Vargo also explained why the shipment of prayer oils from outside vendors would pose unique safety and efficiency concerns. Unlike some products, oils cannot be screened for contraband merely by visual inspection, but instead must be tested for flammability, viscosity, and dangerous substances. *See* Tr. 100:7–12. Vargo testified that the VDOC's contractual relationship with Keefe, and the attendant financial incentives, ensures that Keefe procures the item in the correct container, that it has not been altered or mixed with poisonous additives, and that it is not highly flammable. Tr. 66:12–21. Alternatively, the VDOC would need to individually test every shipment of oils received from other vendors. Tr. 100:17–20. Vargo specifically referenced an instance at a VDOC facility prior to the single-vendor policy where an oil delivered to the facility from an outside vendor was found to be highly flammable. *See* Tr. 101:4–11. Vargo admitted she was not aware of the vendor from which Keefe obtained the prayer oils it offers for sale, but she did testify that Keefe would provide that information if asked and that the VDOC has "certification from Keefe" concerning the prayer oils that Keefe receives from its vendor. *See* Tr. 67:8–14; 69:8–10; 84:18–24. Additionally, Keefe offers for sale only those prayer oils that meet the VDOC's specifications. *See* Tr. 85:11–86:12.

In her testimony, Vargo also discussed two significant exceptions to the single-vendor policy. First, inmates may purchase publications from vendors other than Keefe. Under this policy, inmates can purchase publications from outside vendors so long as the publication does not:

    a.  Pose a threat to the security, discipline, and good order of the facility and is not detrimental to offender rehabilitation

    b.  Promote violence, disorder, or the violation of state or federal law

     c. Contain nudity or any sexually explicit acts, including child pornography or sexual acts in violation of state or federal law

     d. Violate any of the *Specific Criteria for Publication Disapproval*

O.P. 803.2 § IV(A)(4)(a)–(d), Joint Ex. 3, ECF No. 97-4. The VDOC added this exception, according to Vargo, because Keefe does not stock publications. *See* Tr. 58:2–4. Although publication vendors still need to be approved by the VDOC under this policy, Vargo testified that many of these vendors were on the approved list because of longstanding relationships between the vendors and the VDOC. Tr. 59:20–60:4. The VDOC does not, however, have a contractual relationship with publication vendors like it does with Keefe. *See* Tr. 60:9–10.

     Second, inmates can receive religious items from sources other than Keefe if such items are donated to the facility, approved by the Faith Review Committee, and listed on the Approved Religious Items list. Tr. 50:10–16; *see* O.P. 841.3 § VIII(F), Joint Ex. 4, ECF No. 97-5. Outside individuals and organizations could donate approved items at any time, but inmates could receive them only once a year. Tr. 75:9–25. Prayer oils are not among the items approved for donation. *See* Tr. 66:7–11. According to Vargo, prayer oil donated by outside sources poses a security risk because the VDOC would have trouble determining the oil's contents, including its flammability or viscosity. *Id.* In addition, items approved for donation generally are non-consumable items that are more appropriate for inmates to receive annually, such as rugs or kufis. *See* Tr. 74:2–8.

     Finally, Vargo discussed alternatives to the single-vendor policy that the VDOC has considered. She noted that the VDOC's policy for inmates to order items from outside sources has evolved over many years and moved towards adopting a single-vendor policy. Tr. 63:5–11; 121:7–16. Before 2013, the VDOC used commissaries at its facilities, but it did not have a single vendor. Tr. 56:8–16. Though inmates were generally required to order from the commissary, individual facilities allowed inmates to order items from outside vendors as an exception. *See* Tr.

57:1–5; 62:11–16; 64:12–16; 74:10–12; 91:24–92:3. In 2013, David Robinson, the VDOC's Chief of Corrections Operations, issued a directive requiring that all items be ordered through a single vendor. Tr. 57:8–9; 59:2–5, 74:16–21. Vargo acknowledged that the directive merely clarified an existing policy rather than created a new policy altogether. Tr. 57:10–12. She also testified, however, that the VDOC had allowed orders from outside vendors prior to 2013 and so, in effect, a multi-vendor policy "had been considered." Tr. 62:21–25. Vargo did not know whether the VDOC had considered adding a specific vendor, "like Halalco," from whom prisoners could obtain prayer oils. Tr. 70:7–17. The VDOC's previous experience using multiple vendors "wasn't working out as well" and led to the adoption of the single-vendor policy. Tr. 70:13–17; 126:5–25. The principal reasons the VDOC stopped allowing inmates to obtain items from multiple vendors and adopted a single-vendor policy were maintaining security, preventing the introduction of contraband, promoting efficiency, providing uniform products, and ensuring products are sanitary. Tr. 91:23–24; 92:2–95:5; 96:12–21; 97:1–98:3.

## II. Standard of Review

In any action tried without a jury, the Court must make specific findings of fact and state its conclusions of law separately. Fed. R. Civ. P. 52(a)(1). In doing so, "[t]he trial judge has the function of finding the facts, weighing the evidence, and choosing from among conflicting inferences and conclusions those which he considers most reasonable." *Select Auto Imps. Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 823 (E.D. Va. 2016). This task also involves evaluating the credibility of witnesses, and the trial judge may "disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias." *Id.* (citing *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995); *Burgess v. Farrell Lines, Inc.*, 335

F.2d 885, 889 (4th Cir. 1964)). When articulating its findings of fact, "[a] trial court must do more than announce statements of ultimate fact." *United Am. Ins. Co. v. Fauber*, No. 5:16cv19, 2017 WL 3911019, at *3 (W.D. Va. Sept. 6, 2017) (citing *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986)). The Court is not, however, required "to make findings on all facts presented or to make detailed evidentiary findings . . . . The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962).

### III. Findings of Fact

Based on the above background discussion of the competing facts and evidence presented at trial, the Court makes the following findings of fact:

1. At all relevant times, Faver was and continues to be a practicing Orthodox Sunni Muslim incarcerated with the VDOC.

2. Faver's religious beliefs require him to use prayer oils while in a state of prayer.

3. Faver's religious beliefs forbid him from purchasing religious items from vendors that sell "idols, swine, or alcohol." Faver came to fully understand the nature of this belief in 2016.

4. VDOC policy generally requires that inmates purchase personal property from Keefe, the commissary for its facilities. This policy is known as the VDOC's "single-vendor policy."

5. The VDOC has exceptions to its single-vendor policy for religious texts and other publications because Keefe does not offer these products.

6. The VDOC has an exception to its single-vendor policy for approved religious items donated to its facilities. Prayer oils are not approved for donation to VDOC facilities.

7. VDOC policy does not permit inmates to purchase prayer oils from vendors other than Keefe, nor does the VDOC allow prayer oils to be donated to its facilities. There are no exceptions to this policy that would permit inmates to obtain prayer oils from any other source.

8. Faver's belief that Keefe sells pork products, or "swine," is grounded in his Orthodox Sunni Muslim faith.

9. Faver's belief that Keefe sells items associated with other religions, or "idols," is grounded in his Orthodox Sunni Muslim faith.

10. Faver has not purchased prayer oils from Keefe since July 2016.

11. Faver has not been able to use prayer oils consistent with his stated religious beliefs since approximately October 2018.

12. The VDOC's experience with using multiple vendors and its evolution in approach to the provision of commissary items led it to adopt a single-vendor policy in 2013, following a directive from David Robinson, the VDOC's Chief of Corrections Officer, requiring that inmates order all products through a single vendor.

13. The VDOC has entered into a contract with Keefe pursuant to which Keefe has agreed to act as the VDOC's vendor for providing personal property products, except publications, to VDOC facilities.

14. Prior to 2013, the VDOC relied heavily on commissaries to provide products for inmates, but there was no policy strictly requiring products to come from a single

vendor. During that time, inmates were sometimes permitted to order products from other sources.

15. The purposes of the single-vendor policy are to bolster prison security, prevent the introduction of contraband, and more efficiently manage prison resources. The VDOC accomplishes these purposes through its contract with Keefe under which the VDOC can control the products available for inmates to purchase and the procedures for ordering and delivering those products. This contractual relationship is especially important as it concerns the delivery of prayer oils because oils are difficult to screen for flammability or hidden contraband.

16. Prior to the implementation of the single-vendor policy in 2013, the VDOC experienced many security and operational problems from the ordering and delivery of products from sources other than Keefe.

17. No Keefe deliveries have ever contained contraband.

## IV. Conclusions of Law

A.      *Applicable Law*

Faver's only remaining claim before this Court is his cause of action under RLUIPA. In pertinent part, RLUIPA provides that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that the imposition of the burden on that person . . . (1) is in furtherance of a compelling governmental interest . . . and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

1.      *Substantial burden on Faver's religious exercise*

To state a claim under RLUIPA, Faver must show that he seeks to engage in an exercise of his sincerely held religious belief, *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015), and that the challenged practice "substantially burdens [his] . . . exercise of religion," *Lovelace v. Lee*, 427 F.3d 174, 186 (4th Cir. 2006) (quoting § 2000cc-2(b)). In his closing brief, Clarke does not challenge Faver on either of these issues. *See* Def.'s Closing Br. 2–10, ECF No. 104. Moreover, the evidence supports a finding that Faver has met his burden.

First, application of the VDOC's single-vendor policy implicates Faver's Sunni Islam religion. Faver testified that his religious beliefs forbid him from ordering products from vendors that sell "idols, swine, or alcohol." Tr. 12:3–5. Keefe sells swine and idols. Faver further testified that his religious beliefs require the use of prayer oils during prayer so that he could "smell good and not distract anybody around [him] in [their] state of prayer." Tr. 11:18–20.

Faver admitted at trial that he had ordered non-religious items from Keefe, such as hygiene products. *See* Tr. 14: 9–13. Nevertheless, he explained that his religion was "not as strict" regarding the purchase of non-religious items from these vendors. *See* Tr. 13:15–16; 15:15–16:7. Moreover, Faver does not need to establish that the challenged practice is "central to" his religious beliefs. *See* 42 U.S.C. § 2000cc-5; *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) ("RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion."). Instead, he need only show that his requested accommodation is "sincerely based on a religious belief and not some other motivation," *Holt*, 135 S. Ct. at 862. I find Faver's testimony and other evidence sufficient to establish that he has a sincerely held belief that Sunni Muslims must use prayer oil to purify themselves at prayer and that prayer oil should not be obtained from an entity that sells swine or idols.[5]

---

[5] I am not persuaded by Clarke's suggestion at trial that Faver's beliefs were insincere because he ordered prayer oils from Keefe after having signed his Complaint in this case. Tr. 18:20–25; 19:1–23. Faver

Second, Faver must show that the practice in question "substantially burdens [his] . . . exercise of religion." *Lovelace*, 427 F.3d at 186 (quoting § 2000cc-2(b)). RLUIPA does not expressly define what constitutes a "substantial burden," but the Fourth Circuit has explained that such a burden

> is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of his religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of his religion on the other hand.

*Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012) (alterations omitted).

Under the single-vendor policy, Faver must choose between either ordering prayer oils from Keefe, a vendor that sells swine and idols, or praying without oils. Either choice would violate a tenant of Faver's beliefs. Faver faces more than just "substantial pressure" to violate his religious beliefs; he will violate his religious beliefs regardless of which option he chooses. *See DePaola v. Ray*, No. 7:12cv139, 2013 U.S. Dist. LEXIS 117182, at *65–66 (W.D. Va. July 22, 2013) (finding a substantial burden where the prisoner had "no choice" as to whether he would be able to perform obligatory daily prayers in a manner consistent with his sincere religious beliefs). Accordingly, I find that the single-vendor policy substantially burdens Faver's exercise of his religion.

### 2.    *Compelling governmental interest*

Because Faver has established a substantial burden on the relevant religious exercise, the burden shifts to Clarke to prove by a preponderance of the evidence that the VDOC's single-vendor policy furthers a compelling governmental interest. *Couch*, 679 F.3d at 201. In his

---

testified that he had not intentionally ordered oils from Keefe on these dates. Tr. 35:17–25; 36:1–2. There was no evidence presented at trial that Faver used, or even received, these items. Moreover, Faver had not ordered oils from Keefe in more than two years as of the trial date. Accordingly, I find no merit to the argument that the two orders from 2016 draw into question the sincerity of his beliefs.

closing brief, Clarke primarily argues that the policy serves the interest of operating VDOC facilities safely and efficiently. Def.'s Closing Br. 5–8. In general, "the burden of justifying a policy in terms of security concerns is an 'unremarkable step.'" *Couch*, 679 F.3d at 201 (quoting *Lovelace*, 472 F.3d at 190). Indeed, RLUIPA must be applied "with particular sensitivity to security concerns" and with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures." *Id.* (quoting *Cutter*, 544 U.S. at 722). Though a court "should not rubber stamp or mechanically accept the judgments of prison administrators," *id.*, it also must afford "due deference" to explanations from the VDOC's representative "that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline,'" *id.* (quoting *Lovelace*, 472 F.3d at 190). Other judges in this district have held that cost control or operational efficiency can be compelling interests under RLUIPA. *See, e.g.*, *Coleman v. Jabe*, No. 7:11cv518, 2014 WL 2040097, at *3 (W.D. Va. May 16, 2014) (Wilson, J.) (citing *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007)).

I find that Clarke, through Vargo's testimony, has shown that the single-vendor policy serves compelling interests in maintaining prison security and efficiency. Vargo specifically identified ways in which the VDOC single-vendor policy achieves these goals. *Cf. Couch*, 679 F.3d at 201–02 (distinguishing between generic assertions that certain policies bolster prison security and specific explanations as to how a particular policy is able to improve security in a facility). The policy creates more uniformity in products inmates can order, which furthers the VDOC's compelling interest in limiting inmate disputes over different types of property. Vargo gave an example from before the VDOC adopted its single-vendor policy in which differences in the types of shoes inmates could order from outside vendors caused conflict between inmates and encouraged gang affiliation. By narrowing the product choices available to inmates through the

single-vendor policy, the VDOC has been able to reduce institutional conflict and create a more secure facility. Vargo did not explain, however, how the shoe example warranted a need for uniformity in prayer oils. No part of her testimony suggested that allowing inmates to possess different types of prayer oil threatened institutional security simply because the oils were not the same.

More relevantly (and convincingly), the single-vendor policy, along with the VDOC's contract with Keefe, enables the VDOC to control the process for delivery of products to VDOC facilities. As such, the VDOC can more efficiently screen for contraband by using a single, systematic approach to screening packages rather than having to screen deliveries arriving from different vendors on different dates and in different packages, resulting in an irregular and more time-consuming process. Additionally, by controlling the process for ordering products, the VDOC can use its own procedures for inmate order requests. Under this system, the inmate placing the order remains anonymous to Keefe, which reduces the risk of an inmate arranging with a vendor to deliver contraband, a scenario that Vargo testified had occurred prior to the single-vendor policy.

Additionally, the single-vendor policy is particularly important as it concerns shipments of oils. Unlike many products that can be effectively screened through the VDOC's warehouse X-ray scanners, oils can contain hidden contraband, such as drugs or flammable substances, that can only be identified through chemical testing. Under the single-vendor policy, the VDOC has entered into an agreement with Keefe that obligates Keefe to procure products, including prayer oils, that comply with the VDOC's standards for purity and flammability. The contractual relationship and significant financial incentive to Keefe provide an assurance to the VDOC that Keefe will offer for sale only those oils that meet the VDOC's specifications. *See Coleman*, 2014

WL 2040097, at *4. The VDOC can oversee and enforce these requirements by requesting

documentation from Keefe to confirm the nature of the products it procures. Because it is not

practical for the VDOC to perform chemical testing on every shipment of oil sent to each

facility, the single-vendor policy is critical to effective monitoring of those shipments. Thus, in

affording "due deference to the experience and expertise of" Vargo and the other DOC policy

makers, *Couch*, 679 F.3d at 201 (quoting *Cutter*, 544 U.S. at 722), I find that that the single-

vendor system furthers the compelling interests of preventing contraband, which promotes prison

safety and security, and reducing the time prison personnel must devote to checking commissary

shipments, which controls costs. *See Coleman*, 2014 WL 2040097, at *4 (finding that the

VDOC's single-vendor policy furthered the compelling interests of safety, security, and cost

control).

      3.     *Least restrictive means*

      Finally, Clarke must establish that the VDOC's single-vendor policy is the least

restrictive means of achieving its compelling interest in the security and efficient operation of its

facilities. *See Couch*, 679 F.3d at 202. "A 'least restrictive means' is one that does not sweep

'more broadly than necessary to promote the government's interest.'" *Hudson v. Dennehy*, 538

F. Supp. 2d 400, 410 (D. Mass. 2008) (quoting *Casey v. City of Newport*, 308 F.3d 106, 114 (1st

Cir. 2002)). This requirement reflects Congress's intent that courts use a "strict scrutiny"

standard when evaluating policies challenged under RLUIPA. *Lovelace*, 472 F.3d at 186. In his

closing brief, Faver argues that, under strict scrutiny, a defendant must "consider and reject other

means before it can conclude that the policy chosen is the least restrictive means." *See Couch*,

679 F.3d 197 at 203 (quoting *Washington v. Klem*, 497 F.3d 272, 284 (3d Cir. 2007)). The

Fourth Circuit in *Couch* noted that several circuits had adopted this standard and that the Fourth

Circuit had required the government to "acknowledge and give some consideration to less restrictive alternatives" in order to show that the challenged policy is the "least restrictive means" to achieve a compelling interest. 679 F.3d at 203. I find that under either standard, Clarke has carried his burden to show that the single-vendor policy is the least restrictive means.

Faver primarily points to two alternative policy schemes that he argues the VDOC failed to consider under RLUIPA. First, he asserts that the VDOC did not consider a "centralized exception" to the single-vendor policy, similar to the exception that already exists for publications. Pl.'s Closing Br. 22–23, ECF No. 105. I find this argument unpersuasive. The VDOC's publications exception to the single-vendor policy exists primarily because Keefe does not offer publications. Indeed, Vargo testified that she "believe[d] if [the VDOC] could have Keefe . . . manage [its] publications, [it] would." Tr. 58:2–3. Thus, to maximize prison security, it is clear that the VDOC prefers to narrow the scope of available exceptions to the single-vendor policy, rather than broaden them. Moreover, the VDOC has tried a broader set of exceptions to the single-vendor policy in the past. Vargo testified that before the single-vendor policy went into effect in 2013, the VDOC had permitted institutions, at least in certain instances, to order property from other vendors. This practice produced problems for the VDOC, including difficulties screening items delivered from various sources as well as a lack of uniformity in inmate property, which produced conflict among inmates. Having prayer oils delivered from outside sources was particularly problematic because the VDOC could not screen them for contraband without burdensome testing. The VDOC's experience allowing multiple vendors to provide items for inmate purchase drove the reasons for the VDOC's adoption of the single-vendor policy. Faver's proposed alternative fails to appreciate that the VDOC made this decision, not in a vacuum, but based on years of experience trying to manage the safety, security,

and staffing challenges presented by multiple vendors shipping items to prison facilities. Considering this history, the VDOC reasonably determined that the single-vendor policy was the least-restrictive means to further its compelling interests.

Faver argues that the VDOC's prior practice of allowing case-by-case exceptions to the single-vendor policy is distinct from the "centralized, uniform exception" that he proposes for religious items. Pl.'s Closing Br. 22. This is a distinction without a difference. The VDOC, as explained by Vargo, could reasonably foresee that problems it experienced with its pre-2013 policy scheme would return under a uniform policy permitting inmates to order religious items from other vendors besides Keefe. Indeed, the VDOC could not rely on a single, systematic approach to screening packages from a single vendor, but would need to scan deliveries arriving from different vendors on different dates, and in different packages. Furthermore, because the VDOC would not necessarily control the terms of the ordering process, it could not ensure anonymity between buyer and seller such that inmates could more easily work with outside vendors to try and smuggle contraband into facilities. Finally, the VDOC would not have the same guarantees as to the contents of products—such as religious oils—as it does with Keefe and would need to devote additional staff resources for testing and screening products shipped to its facilities. The single-vendor policy, according to Vargo, has furthered all of these goals. The VDOC has reasonably determined, based on experience, that allowing exceptions would reignite the problems it sought to extinguish. Accordingly, I find that Faver's proposed religious items exception is not a less restrictive means for achieving VDOC institutional security.

Second, Faver argues that the VDOC failed to consider entering into a contract with an Islamic vendor similar to its contract with Keefe. Pl.'s Br. 20–22. I also find this argument to be without merit. As a threshold matter, Faver presented no evidence to show that a vendor

acceptable to his religious beliefs would be amenable to the same terms of the agreement between the VDOC and Keefe.[6] Indeed, the VDOC contract imposes a number of rigorous requirements on the contractor, including possible audits, Keefe Contract § III(A), Joint Ex. 5, ECF No. 97-6, background investigations of contractor staff, *id.* § III(R), and compliance with Virginia's Small Business Subcontracting Plan, *id.* § III(G). While Clarke does bear the burden to show that the VDOC has "acknowledge[d] and giv[en] some consideration to less restrictive alternatives," than the single-vendor policy, *Couch*, 679 F.3d at 203, he does not need to "refute every conceivable option to satisfy" this burden, *Maxwell v. Clarke*, No. 7:12cv477, 2013 U.S. Dist. LEXIS 83461, at *21 (W.D. Va. June 13, 2013). Here, Faver has produced no evidence that a contract between the VDOC and an outside Islamic vendor is even possible. *See Legatus v. Sebelius*, 988 F. Supp. 2d 794, 811 (E.D. Mich. 2013) (explaining that the government "must refute the alternative schemes offered by the challenger, but it must do [so] through the evidence presented in the record"). I will not find that Clarke has failed to meet his burden simply because Faver can imagine "some hypothetical alternative that [the VDOC] do[es] not appear to have considered." *Cf. Forter v. Geer*, 868 F. Supp. 2d 1091, 1105 (D. Or. 2012) (citing *Ill. State Bd.*

---

[6] In his closing brief, Faver argues that Clarke "admitted [the VDOC] could enter into a contract with an Islamic vendor containing all the same provisions as the Keefe contract." Pl.'s Closing Br. 26. He cites to the following exchange between his counsel and Vargo:

> Q:    The VDOC could also contract with [an Islamic vendor] to provide specifically Islamic religious items; is that correct?
>
> A:    Anything is possible, yes.

Tr. 123:9–12. This blanket statement by Vargo is not evidence that she was aware of an Islamic vendor ready to accept a contract with the same terms as the VDOC's contract with Keefe. Indeed, as Faver points out, Vargo later acknowledged that the VDOC had not considered entering into a contract with a vendor to provide Islamic prayer oils. Pl.'s Closing Br. 26 (citing Tr. 126:20–25). Thus, Vargo could hardly testify that she knew of an Islamic vendor willing to accept the same contract terms. Instead, her testimony that "[a]nything is possible," suggests that the VDOC could, at least in theory, enter into a products contract with an Islamic vendor. But that acknowledgement alone does not show that Faver's proposed alternative is anything more than hypothetically possible.

*Elec. v. Socialist Workers Party*, 440 U.S. 173, 188–89 (1979)) (explaining that a court should not deny summary judgment on this ground); *see also Hudson*, 538 F. Supp. 2d at 410 (explaining that prison authorities "must consider and reject other plausible means before determining that the policy they implement is the least restrictive means of furthering a compelling State interest").

Furthermore, as explained above, I find the VDOC has considered the use of multiple outside vendors in the past because it permitted exceptions to the single-vendor policy before 2013. That practice proved to undermine the VDOC's compelling interests in safety, security, and cost control, leading to adoption of the single-vendor policy. A contract with another outside vendor would again force the VDOC to work with multiple vendors, resurrecting at least some of the problems the VDOC experienced before its single-vendor policy, such as burdensome searches of commissary orders and increased risk of introduction of contraband into the facilities. Accordingly, I find that the VDOC's single-vendor policy is the least restrictive means to further its compelling interests.

### V. Conclusion

For the foregoing reasons, the Court concludes that Clark did not violate Faver's rights under RLUIPA and that Faver is not entitled to relief. A separate Order will enter.

The Clerk shall send a copy of this Memorandum Opinion to all remaining parties.

ENTER: September 30, 2019

Joel C. Hoppe
United States Magistrate Judge